UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.   12-31073 (JBR) |
| | ) | |
| EM EQUIPMENT, LLC, | ) | CHAPTER   7 (INVOLUNTARY) |
| | ) | |
| DEBTOR. | ) | ECF NO.   1 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## APPEARANCES

Patrick W. Boatman, Esq.                    Attorneys for Petitioning Creditor
Benjamin R. Plourd, Esq.
Law Offices of Patrick W. Boatman, LLC
111 Founders Plaza, Suite 1000
East Hartford, CT 06108

Michael S. Bonnano, Esq.                    Attorney for Alleged Debtor
Geraghty & Bonnano LLC
38 Granite Street
P.O. Box 231
New London, CT 06320

## MEMORANDUM OF DECISION

### I.   Introduction

This matter came before the Court for trial on the Involuntary Petition filed by the

Plaintiff/Petitioning Creditor, The Kerin Agency, Inc. pursuant to Chapter 7 of the

Bankruptcy Code and the provisions of 11 U.S.C. § 303(b). The Defendant/alleged debtor,

EM Equipment, LLC, contested this involuntary petition. ECF No. 6. The case was tried

before now-retired Judge Lorraine Murphy Weil over the course of several days between

September 11, 2012 and January 3, 2013.[1] The case was subsequently assigned to this

Court.[2] On November 18, 2013, this Court certified, pursuant to Federal Rule of Bankruptcy

Procedure 9028, that it had reviewed and was familiar with the docket and pleadings in

this matter, including the transcripts and/or recordings of the evidentiary hearings and

exhibits admitted during those hearings and could complete this contested case without

prejudice to the parties.  Having considered the testimony, demeanor, and credibility of

witnesses[3], the following constitutes the Court's findings of fact and conclusions of law in

accordance with the Federal Rule of Bankruptcy Procedure 7052.

## II.    Factual Background

On March 19, 2012, the Kerin Agency, Inc., (the "Kerin Agency" or "Kerin") an

insurance agency and the sole petitioner in this matter, filed the instant involuntary

bankruptcy petition against the alleged debtor, EM Equipment, LLC. ("EM"). ECF No. 1.

Commencing on or about the insurance policy year 1998 – 1999, The Kerin Agency

provided Timothy Bonanno, the sole member of EM, with insurance services and also

provided such services to some of Bonanno's affiliated companies. See Tr. (9/11) at 39-40.

---

[1] The following convention is used in citing to the trial record. The daily trial transcripts are cited by date and page. Thus, for example, "Tr. (9/11), at 35" refers to the September 11, 2012 transcript, at page 35.

[2] Throughout the record and the parties' submissions to the Court, passing reference is made to state court litigation between the parties to this matter. See, e.g., ECF No. 90 at 2; ECF No. 78 at 2, FN1. However, the Court has no knowledge of what issues the state court litigation concerned, nor was any evidence introduced in that regard.

[3] The Court acknowledges that, this case having been tried before another Judge, this Court was not present to observe the live demeanor of the witnesses as they testified at trial. However, the Court also notes that witness credibility may be tested effectively – even where the trier of fact did not get to see and observe the physical demeanor of the witness – through an examination of the logical strength, or lack thereof, of the witness' testimony as it appears in the written and recorded record.  The Court applied such an approach to all witness testimony in this matter.

The Kerin Agency first insured EM during the 2004 – 2005 insurance policy year. See Tr. (9/11) at 45.

The Kerin Agency provided insurance services to EM on credit, and demonstrated that an unpaid balance began accruing in the 2006 -2007 insurance policy year. See Tr. (9/11) at 67-68; see also Exs. A, B.

Starting in the 2009 – 2010 insurance policy year and continuing thereafter, Kerin placed EM on direct billing with the insurance carrier, whereby EM would be responsible for paying its premiums directly to the carrier. See Tr. (9/11) at 68-69.

Kerin demonstrated the following amounts as due and owing from EM for various types of coverage actually provided and accepted by EM but not paid for: Umbrella coverage $3,109.00; Auto coverage $6,903.34 and; General Liability coverage $7,366.00. See Ex. A.

Kerin further alleged that $3,939.00 was due and owing from EM for Equipment Coverage; EM provided testimony that it disputed its liability for this coverage as it asserted it never owned any equipment to be thus insured. See, e.g., Tr. (12/13) at 59.

The record shows that Bonanno and several of his entities were additional insureds on several of the policies. See, e.g., Tr. (9/11) at 174; Tr. (12/10) at 39, see also, Ex. II at 21.

The record further reflects that money paid to Kerin was from Bonanno-affiliated entities' funds regardless of which affiliate was obligated or benefitted. See, e.g., Tr. (9/11) at 141; Tr. (12/10) at 107; Tr. (12/13) at 20-21; Tr. (1/3) at 30-32. There was no evidence presented that any intercompany obligations were ever reconciled between the parties.

The total amount claimed by Kerin is $21, 317.34. See Exs. A, B.

3

On April 1, 2004 or thereabouts, EM borrowed $121,096.00 from Chelsea Groton Bank to purchase a Kenworth dump truck (the "Kenworth"). See Ex. OO.

On September 19, 2007, the Kenworth debt was paid off in the amount of $41,858.63 when Olive Street Associates, LLC, ("Olive Street"), another Bonanno-affiliated entity, obtained a loan, issued a mortgage on its property and used a portion of the proceeds to pay Chelsea Groton Bank. See Tr. (12/12) at 137-149; Tr. (12/13) at 38; see also Ex. PP. There is nothing in the record showing that EM ever reimbursed Olive Street for paying off the EM loan.

On April 19, 2011, EM instructed Kerin by email to delete EM from all outstanding insurance policies and coverages. See Ex. F.

On October 6, 2009, Tim Bonanno General Contractor, LLC, another Bonanno-affiliated entity, obtained a separate loan from Chelsea Groton Bank, allegedly pledging the Kenworth as collateral. See Ex. QQ.

At some point in October of 2010, EM sold the Kenworth for approximately $45,000 and paid over the proceeds to Chelsea Groton Bank to pay down the 2009 Tim Bonanno General Contractor, LLC loan. See Tr. (12/13) at 39-41; Tr. (12/13) at 45; Tr. (12/13) at 48-49; see also Exs. R, U, QQ, RR.

As of the date of filing of this petition EM was no longer an operating company and had been formally dissolved with the Connecticut Secretary of State's Office; additionally, uncontroverted testimony indicated that EM had no tangible assets since the sale of the Kenworth truck. See Tr. (12/10) at 54-57; Tr. (12/20) at 26-27; see also Ex. 75.

4

### III.   **Discussion**

Involuntary bankruptcy cases such as the instant matter are governed by 11 U.S.C.

§ 303. As such, on March 19, 2012, when this petition was filed, the provisions of § 303(b)

mandated in relevant part that:

> [a]n involuntary case . . . is commenced by the filing with the court of a petition under
> chapter 7 or 11 of this title –
> (1) by three or more entities, each of which is either a holder of a claim against such
> person that is not contingent as to liability or the subject of a bona fide dispute as to
> liability or amount, . . . if such noncontingent, undisputed claims aggregate at least
> $14,425[4] more than the value of any lien on property of the debtor securing such
> claims held by the holders of such claims;
> (2) if there are fewer than 12 such holders, excluding any employee or insider of such
> person and any transferee of a transfer that is voidable under section 544, 545, 547,
> 548, 549, or 724(a) of this title, by one or more of such holders that hold in the
> aggregate at least $14, 425[5] of such claims[.]"

11 U.S.C. § 303(b) (West 2012).  Additionally 11 U.S.C. § 303(h) – which has remained in
force and unchanged since the petition filing date in this case – further states in relevant
part that:

> [i]f the petition is not timely controverted, the court shall order relief against the
> debtor in an involuntary case under the chapter under which the petition was filed.
> Otherwise, after trial, the court shall order relief against the debtor in an involuntary
> case under the chapter under which the petition was filed, only if—
> (1) the debtor is generally not paying such debtor's debts as such debts become due
> unless such debts are the subject of a bona fide dispute as to liability or amount; or
> (2) within 120 days before the filing of the petition, a custodian, other than a trustee,
> receiver, or agent appointed or authorized to take charge of less than substantially all
> of the property of the debtor for the purpose of enforcing a lien against such property,
> was appointed or took possession.

---

[4] Pursuant to 11 U.S.C. § 104, the noncontingent, undisputed dollar amount required under
11 U.S.C. § 303(b) is occasionally adjusted by the Judicial Conference of the United States.
As such, the current statutory dollar amount required by 11 U.S.C. § 303 (b)(1) and (2) as of
the date of this opinion, $15,325, see 11 U.S.C. § 303(b) (West 2013) differs from the dollar
amount that was required under 11 U.S.C. § 303(b) on the date that this involuntary
petition was filed in March of 2012, namely $14,425, see 11 U.S.C. § 303(b) (West 2012).
Pursuant to standard practice in involuntary bankruptcy cases, the Court will be applying
the statutory dollar amount that was in effect on the date that the petition was filed.

[5] See FN 4, supra.

11 U.S.C. § 303(h). The "[p]etitioning creditor[] bear[s] the ultimate burden of proving that
all statutory requirements of . . . . Section 303 have been met." In re Palace Oriental Rugs,
Inc., 193 B.R. 126, 128 (Bankr. D. Conn. 1996). "Specifically, [the petitioning creditor]
bear[s] the burden of establishing the 'jurisdictional' prerequisites of Section 303(b)." Id.
Similarly, the petitioning creditor "bear[s] the ultimate burden of proving by a
preponderance of the evidence that the Alleged Debtor is generally not paying its debts as
such debts become due." 193 B.R. at 128.

    In the instant case, EM timely controverted the petition and trial was conducted
over several days. The Court will now turn to the statutory requirements of 11 U.S.C. § 303
as applied to this involuntary petition.

## A. Bona Fide Dispute As To Liability and/or Amount

    As the Court in In re Rand Int'l Leisure Prods., LLC, No. 10-71497 (AST),  2010 WL
2553999 (Bankr. E.D.N.Y. June 18, 2010) observed in the context of an involuntary
bankruptcy with regard to § 303's references to "bona fide" disputes as to liability and/or
amount:

> The Court of Appeals for the Second Circuit adopted an "objective test" to define the
> term "bona fide dispute." Key Mechanical, Inc. v. BDC 56 LLC (In re BDC 56 LLC), 330
> F.3d 111, 118 (2d Cir. 2003). To determine whether a *bona fide* dispute exists, the
> bankruptcy court 'must determine whether there is an objective basis for either a
> factual or a legal dispute as to the validity of the debt.' Id. at 117. The objective
> standard allows a creditor to be disqualified whenever there is any legitimate basis for
> the debtor not paying the debt, factual or legal. The Bankruptcy Abuse Prevention and
> Consumer Protection Act of 2005 ("BAPCPA") amended Section 303 and expanded the
> issue of a bona fide dispute to encompass not only issues of liability but also issues of
> the amount owed.
>
> When applying the objective test, the Second Circuit also adopted a burden-shifting
> framework. In re BDC 56 LLC, 330 F.3d at 118. A petitioning creditor must first
> establish a prima face [sic] case that no *bona fide* dispute exists before the burden
> shifts to the debtor . . . . Because the standard is objective, neither the debtor's
> subjective intent nor his subjective belief is sufficient to meet this burden." Id.

2010 WL 2553999 at *3-4 (quoting In re Ishaky, No. 09-40387 (DEM), 2010 WL 935572 at

*3 (Bankr. E.D.N.Y. Mar. 11, 2010)) (italics in original). Also, "under the creditor

qualification standards of Section 303(b)(1), the relevant question is whether the claims of

petitioning creditors were the subject of a bona fide dispute on the petition date." In re

Palace Oriental Rugs, 193 B.R. 126, 129 (Bankr. D. Conn. 1996). Further, although "the

[c]ourt is not precluded from considering post-petition evidentiary developments . . . in

determining the petition date status of claims," the focus of the Court in this regard should

remain on the petition date status of claims. Id. The Court now turns to an application of

this standard first as to liability, and then as to amount of the asserted debt in this case.

### a. Non-Equipment Related Charges

#### i. Liability

At trial and in its post-trial submissions, EM repeatedly asserted that it disputed

both the existence of liability, as well as the amount of any such alleged liability specifically

as to the equipment charge. See, e.g., ECF No. 78, EM's Post-Trial Brief, at 7 ("The

Equipment Charge is Disputed As to Liability and Amount") (capitalization and underline in

original). And yet, as EM itself readily admits, the "equipment charge" that EM disputes

constitutes only $3,939.00 of the total of $21,317.34 in debt that the Kerin Agency asserts

EM owes it. ECF No. 78 at 9.

Indeed, as EM also readily admits in its submissions, the Kerin Agency's exhibits and

testimony "purport[] to show that EM has an unpaid balance for the year of 2006 for an

'Umbrella Renewal' and 'Auto Policy Renewal'; for 2007 for a 'General Liability Renewal',

'Auto Renewal' and [']Umbrella Renewal'; and the same for 2008 except that in 2008 Kerin

adds on a charge for 'Equipment Renewal.'" ECF No. 78 at 9. The Court notes that in support

of this "purport[ed] show[ing]," to borrow EM's language, Kerin introduced substantial

evidence – consisting of, inter alia, billing statements, items of correspondence, insurance

proposals and policies and witness testimony, all showing that these general liability, auto

and umbrella policies were in fact procured and applied to cover EM Equipment in the

years indicated. For EM's part, there was no evidence or testimony that indicates these

coverages were not provided nor that EM ever objected to them or evinced a desire that

they be removed or cancelled. Additionally, there is no evidence from alleged debtor EM

affirmatively showing payment of these obligations.

EM nonetheless asserts that "[t]he bona fide dispute [as] to the debt and liability is

not limited simply to the existence of the equipment charge to EM on the 2008 policy . . . .

[rather i]t also stems from Kerin's misapplication of payments that were made to Kerin on

behalf of EM."[6] ECF No. 78, at 13. The content of this "misapplication" argument goes both

to disputing the amount and also the overall validity of the debt Kerin alleges EM owes. As

such, the Court will also discuss it when taking up the issue of amount subject to bona fide

dispute. In short however, as the case law cited above clearly indicates, because the

standard is objective, "neither the debtor's subjective intent nor his subjective belief is

sufficient to meet [his] burden" of showing a bona fide dispute. 2010 WL 2553999 at *3-4.

Rather, what is required is "an objective basis for either a factual or a legal dispute as to the

validity of the debt."

---

[6] EM has further represented in a recent submission to the court that "[t]he record is
replete with instances of disagreement of charges between the parties . . . ." ECF No. 90 at 2.
However, "replete" is not an evidentiary citation. The Court notes that it conducted a
telephonic question and answer session with attorneys for the parties and specifically
asked for exact citations on this issue. EM's inability to be specific in this regard very telling
and the Court accepts Counsel's statement as the best "evidence" he could find.

Applying this standard, the Court notes that under either one of the two conflicting applications of the July 28, 2008 $20,000 payment that are reflected in the evidence, neither approach operates to negate the whole, nor even a portion of EM's underlying liability for the coverages it was provided. Specifically, if the $20,000 were allocated as Exhibits B, 56, 57, and 58 all show, it would not affect EM's liability because, that approach, which utilizes $2,739.33 of the $20,000 payment to reduce EM's total outstanding debt to $21,317.34 is apparently the very approach that Kerin actually used to arrive at the $21,317.34 total debt amount listed in its involuntary petition. Accordingly, applying that approach clearly results in no change to the total debt amount alleged by Kerin in the underlying petition.

Similarly, if the $20,000 were instead allocated as Exhibit D shows, it would also not negate nor lower EM's liability below the $21,317.34 amount listed in the complaint. This is because under this second approach, none of the $20,000 payment is utilized to lower EM's total debt. Thus EM's total alleged debt under such an approach would theoretically be $24,056.67, a debt amount several thousands of dollars greater than that listed in this involuntary petition. In conclusion, neither approach negates all or any portion of the amount of debt alleged in this matter. As such, while this difference between Exhibit D and Exhibits B, 56, 57 and 58 certainly reflects an inconsistency between the documents, the Court concludes that a "bona fide" dispute as to liability – or amount, see infra – is not shown on this evidence because the result arrived at pursuant to either side of this so-called "dispute" does not provide "any legitimate . . . factual or legal . . . basis for the debtor not paying the debt [alleged in the petition]". In re Rand Int'l Leisure Prods., LLC, 2010 WL 2553999 at *3-4 (Bankr. E.D.N.Y. June 18, 2010).

9

Thus, EM's assertion - that Ex. D is inaccurate as to the final application of a single $20,000 payment to Bonanno accounts including EM – nonetheless does not provide any objectively valid basis in fact or law for concluding that EM should be no longer liable for the underlying debt. Instead, the record in this matter demonstrates no more than, at best, a subjective belief on the part of Bonanno on the petition date, that EM's underlying liability for the debts at issue were in dispute. The Court concludes this showing of subjective disagreement is insufficient to create a bona fide dispute as to liability.

Further, after a thorough review of the extensive record in this matter, the Court is particularly struck by how apt and relevant the legal doctrine of estoppel is to this question of bona fide dispute as to liability for EM's several asserted debts.  Although no court in this jurisdiction has touched directly on the issue, the Court notes that in other jurisdictions it has long been established, in the context of a contract for insurance, that "an applicant for insurance may be estopped to deny liability for premiums . . . ." Keller v. Provident Life & Acc. Ins. Co., 49 S.E.2d 577 (S.C. 1948). See also, Westchester Fire Ins. Co. v. Gurian, 101 N.Y.S. 50 (1906) ("It cannot be doubted that a promise to pay the premium may be implied from the acceptance and retention of the [insurance] policy by the defendant"); 45 C.J.S. Insurance § 696 (2013) ( ". . . estoppel may arise from the insured's acceptance of a policy and retention thereof for such period and under such circumstances as give rise to an implied promise to pay"). The Court finds merit in the application of these estoppel principals to the instant case, whereby EM would be estopped from asserting a bona fide dispute as to liability for the non-equipment-related coverages that Kerin has shown EM received and took the benefit of without contradiction or complaint. The Court further

10

notes that there is no evidence that EM or any other Bonanno entity secured the subject

coverage elsewhere.

Ultimately, the Court concludes that Kerin carried its burden of establishing a *prima*

*facie* case of undisputed liability by EM to Kerin for multiple policy premiums in excess of

the statutory minimum, which EM then failed to rebut through evidence or testimony that

evinced a "legitimate basis for the debtor not paying the debt".

### ii. Amount

As aptly stated by a sister bankruptcy court in this circuit, in In re Taub, 439 B.R.

261, 275 (Bankr. E.D.N.Y. 2010), the analysis of the existence of a bona fide dispute as to

amount is a source of real disagreement amongst bankruptcy courts throughout the United

States. As the In re Taub court explained:

> [s]ome bankruptcy courts have found that any dispute as to the amount of a petitioning
> creditor's claim renders that claim subject to a bona fide dispute as to amount. In re
> Orlinsky, No. 06–15417–BKC–RAM, 2007 WL 1240207, at *1 (Bankr. S.D. Fla. Apr. 24,
> 2007). See also Mountain Dairies, Inc., 372 B.R. at 634 (" '[A]ny dispute regarding [ ]
> amount that arises from the same transaction and is directly related to the underlying
> claim should render the claim subject to a *bona fide* dispute.' ") (quoting In re Euro–
> American Lodging Corp., 357 B.R. 700, 712 n. 8 (Bankr. S.D.N.Y. 2007)); In re Regional
> Anesthesia Assocs., 360 B.R. 466, 477 (Bankr. W.D. Pa. 2007) (same). Other bankruptcy
> courts conclude that a bona fide dispute as to amount is not relevant unless it has the
> potential to reduce the total of the petitioner's claim below the statutory threshold. In
> re DemirCo Holdings, Inc., No. 06–70122, 2006 WL 1663237, at *3 (Bankr. C.D. Ill.
> 2006).

In re Taub, 439 B.R. 261, 275 n. 3 (Bankr. E.D.N.Y. 2010). However, the Second Circuit has

not ruled on the issue, nor has any district court in this district. The In re Taub court itself

deftly avoids the issue by holding that the petitioning creditor "is not an eligible petitioning

creditor for the purposes of § 303 under either interpretation of the statute." 439 B.R. at

275 n. 3. Further confusing matters, some cases from bankruptcy courts in this circuit,

namely those cited above, In re Mountain Dairies and In re Euro-American Lodging Corp.

adopt the position that any bona fide dispute as to a portion of the alleged debt creates a

bona fide dispute as to the entire alleged debt. However these cases do not constitute

binding authority on this Court and are factually distinguishable from the instant matter in

significant ways that the Court concludes make them inapplicable here.

Specifically, the Court notes that the relied-upon reference in In re Euro-American

Lodgings Corp. regarding the effect on creating a bona fide dispute as to the amount at

issue, of disputes as to some, but not all of the debt appears merely in the context of a

footnote, and was not central to the court's analysis in the case. See, e.g., 357 BR at 712

("The principal dispute centered on whether [the alleged debtor] had 12 or more creditors,

as of the Petition Date . . . [and, further, the petitioning creditor in Euro-American had]

easily satisfied . . . the test [of whether] . . . the petitioning claimholder's claim is not

contingent as to liability or subject to a *bona fide* dispute as to liability or amount"). For its

part In re Mountain Dairies involved a petitioning creditor who the court found "never

provided clear documentation of a sum certain that would be due . . . [and thus the court

concluded that the petitioning creditor] . . . ha[d] not met its burden of demonstrating that

Mountain Dairies is liable to any particular amount." In re Mountain Dairies, 372 B.R. 623,

631 (Bankr. S.D.N.Y. 2007). In other words, the Mountain Dairies petitioning creditor had

been unable to prove a specific amount "above the $13,475 threshold in 11 U.S.C. § 303(b),

[was] not . . . in dispute." Id. at 634.

As to the amount in question in the instant case, EM has asserted that a "bona fide

dispute [as] to the debt and liability . . . [arises here] from Kerin's misapplication of

payments that were made to Kerin." ECF No. 78, at 13. As discussed, supra, this

"misapplication" argument is a reference to inconsistencies, noted in testimony and

apparent in the documents themselves, between how a certain July 28, 2008, $20,000 payment was allocated according to Exhibit D on the one hand, and Exhibits B, 56, 57, and 58 on the other. Kerin responds that "[w]hether the final application of that $20,000.00 payment could have been more clearly illustrated does not give rise to a bona fide dispute over the liability or amount EM still owes Kerin." ECF No. 79 at 17. The Court, mindful of the standards applicable to a finding of a "bona fide issue" as to liability or amount, supra, agrees. The Court must be determine whether "any legitimate basis for the debtor not paying the debt, factual or legal" is shown.

In the instant case, the Court notes that, even in light of Ex. D's inconsistency with other records in this matter as to the allocation of the $20,000 payment, that inconsistency would not in any event operate to in any way reduce the amount of debt that is reflected – without contradiction by EM – as owed in Exs' B, and 56, 57, and 58 and alleged as owed in the petition. Stated more simply, applying the allocation reflected in Ex D instead of that reflected in Exs' B, 56, 57 and 58 would not in any way reduce the $21,317.34 amount which formed the total claim made in this petition (i.e. the total of both equipment-related and non-equipment-related debts owed). Accordingly, as to the non-equipment-related debt, the Court concludes that no legitimate factual or legal basis has been shown for EM not paying the non-equipment-related debt in the amount of $17,378.34.

Thus, even construing the record in a light most favorable to EM Equipment and entirely discounting the $3,939.00 equipment related charge over which EM argues a bona fide dispute exists, there still remains $17,378.34 in apparently uncontested debts see infra, which The Kerin Agency established through both documentary evidence and witness testimony. This is a sum certain well in excess of the statutory threshold required

under § 303(b) at the time the petition was filed. The Court deems it just and appropriate in such a case to adopt the approach enunciated in In re DemirCo Holdings, Inc., No. 06–70122, 2006 WL 1663237, at *3 (Bankr. C.D. Ill. 2006), whereby a bona fide dispute as to amount is only relevant if it reduces the amount not in dispute below § 303(b)'s statutory threshold.

The Court concludes, on the basis of the testimony and evidence discussed above, that Kerin carried its burden of establishing a *prima facie* case of a debt in the amount of at least $17,378.34 by EM to Kerin, an amount in excess of the relevant statutory minimum, which EM failed to rebut through evidence or testimony that evinced a "factual or legal dispute" as to this amount being owed. Accordingly, the Court further concludes that there exists no relevant bona fide dispute as to amount that would bar this involuntary petition.

### b. Equipment-Related Charges

As stated above, the Court has concluded that, even crediting EM's assertion that the entire asserted equipment-related debt of $3,939.00 were found to be subject to a bona fide dispute as to liability or amount, that fact would not operate to bring the amount not in dispute below §303's statutory bar. Nonetheless, in an effort to be thorough, the Court will further take up EM's arguments regarding this alleged $3,939.00 equipment-related debt. As EM correctly points out, the Court is mindful at the outset that its function, in determining whether the equipment charge is disputed as to either liability or amount is to "ascertain whether a bona fide dispute exists, but 'is not to actually resolve the dispute,'" ECF No. 78 at 7; In re Mountain Dairies, Inc., 372 B.R. 623, 634 (Bankr. S.D.N.Y. 2007) (emphasis in original).

14

### i. Liability and Amount

EM first argues that "EM never owned any insurable equipment . . . and Kerin had no facts to prove otherwise . . . [thus] if EM didn't own the equipment, then it cannot be liable for the premium to insure it." ECF No. 78. Kerin responds that "[t]he various pieces of construction equipment had been listed under another Bonanno entity in previous years, until Kerin was directed by Bonanno in 2008 to switch the equipment over to EM . . . [and t]his change was documented in the 2008-2009 proposal and in each of the subsequent proposals in the years that followed . . . [thus a]lthough Kerin did not have any written confirmation from EM regarding the requested change, EM received proposals each year without ever raising the equipment issue to Kerin or the insurance carrier." ECF No. 79 at 12.

In analyzing this issue the Court notes that there is conflicting testimony in the record as to whether or not Bonanno instructed Kerin to change the policies in the 2008 insurance coverage year to reflect the fact that EM owned the construction equipment. The Court further notes that several admitted exhibits attest to the fact that the equipment was not so listed as owned by EM in prior coverage years. Additionally, aside from oral testimony from two witnesses, Kerin had no further evidence to substantiate their claim of having been instructed to make the change. There is also no evidence that Bonanno, for his part, objected to the equipment ownership attribution change – a change which was clearly reflected in policy proposals Bonanno received at the time – prior to the initiation of this involuntary case several years later. The issue thus comes down to a judgment between conflicting sets of testimony. At first blush, this showing of a dispute as to ownership appears to provide the basis for a finding of bona fide dispute as to liability regarding the

alleged equipment charge debt and likely also as to amount. However, the Court considers the issue to be less straightforward than this.

The Court notes that the timeframe within which this alleged objection to EM's ownership of the equipment was first asserted by EM, aside from potentially giving rise to issues of estoppel, discussed infra, also disqualifies any dispute as to liability and/or amount arising from this objection from being classified as "bona fide". Indeed, EM's own recent submission to the Court on this exact issue conceded that "[i]t is not possible for EM to simply identify when it notified Kerin that they had the [equipment] wrongfully attributed to EM ownership because EM didn't fully understand the extent of that issue until the litigation started." ECF No. 90 at 3. The Court considers this an admission by EM that its objection to this ownership attribution of the construction equipment did not arise until after this litigation had been filed - which is not contradicted but rather finds support in testimony – disqualifies this issue as constituting a bona fide dispute as to either liability or amount.

Case law precedent clearly states that "under the creditor qualification standards of Section 303(b)(1), the relevant question is whether the claim of petitioning creditors were the subject of a bona fide dispute on the petition date." In re Palace Oriental Rugs, 193 B.R. 126, 129 (Bankr. D. Conn. 1996). While the Court may "consider[] post-petition evidentiary developments . . ." such post-petition considerations are only intended to be used in aid of ". . . determining the petition date status of claims," Id. (emphasis added). Disputes as to liability or amount that first arise post-petition, as the uncontroverted evidence suggests was the case with regard to this alleged equipment ownership attribution dispute, are thus not relevant under such an analysis. The Court accordingly concludes that Kerin carried its

burden of establishing a prima facie case of a debt that is not subject to bona fide dispute as to liability or amount with regard to the $3,939.00 equipment-related debt. Additionally, EM failed to rebut this showing as the evidence and the record indicated that this alleged dispute as to the equipment related debt first arose post-petition. Accordingly, the Court further concludes that there existed no bona fide dispute as to liability or amount on the petition date with regard to this equipment-related debt that would bar this involuntary petition. Looking back after the petition date and "discovering" disputed issues, does not give rise to a bona fide dispute as of the petition date.

Additionally, although the Court has already concluded that no "bona fide" dispute as to liability or amount exists with regard to this equipment charge, drawing on the case law cited, supra, regarding estoppel in the insurance coverage context, the Court also notes that EM may be estopped from asserting a dispute as to liability or amount for the construction equipment premiums at issue. Specifically, as already expressed, supra, in this case the Court deems it just and appropriate to adhere to the maxim stated in other circuits and in treatise materials that "estoppel may arise from the insured's acceptance of a policy and retention thereof for such period and under such circumstances as give rise to an implied promise to pay." 45 C.J.S. Insurance § 696 (2013).

In the instant case, it is clearly reflected in the exhibits that, although in years prior to 2008, the proposals Kerin sent to EM via Bonanno made no mention of EM as an owner of this construction equipment, this changed in the policy year 2008, when the proposal clearly lists EM as an owner. There is no dispute that this proposal was submitted to Bonanno for review and comment and that he did receive it. As such, Bonanno clearly had notice of the ownership attribution change at the time it was proposed to be made. There

is also no dispute in the record that Bonanno made no objection at the time, when the

change was made in 2008, to the procurement of the coverage, the attribution of ownership

of the construction equipment to EM, nor, once the equipment coverage was procured, to

the benefit that he and other Bonanno entities, via EM, were receiving. The Court finds

itself again circling back to EM's own recent statement that "[i]t is not possible for EM to

simply identify when it notified Kerin that they had the [equipment] wrongfully attributed

to EM ownership because EM didn't fully understand the extent of that issue until the

litigation started." ECF No. 90 at 3. The Court deems this statement, that EM did not

"understand the extent of [this] issue until the litigation started" to be telling. The Court has

difficulty crediting such late-arising dissent to a change that was made many many years

prior to the filing of this action and to which over all that time, the allegedly aggrieved

party never objected.

In conclusion, the Court further notes that, although it has concluded that no bona

fide dispute as to liability or amount has been shown as to the equipment charge, such a

bona fide dispute would not bring Kerin's total claim below the statutory minimum

established by § 303. Accordingly, such hypothetical bona fide dispute would not be

relevant and would not serve as a bar to the instant involuntary petition. See supra; In re

DemirCo Holdings, Inc., No. 06-70122, 2006 WL 1663237, at *3 (Bankr. C.D. Ill. 2006).

## B. Generally Not Paying Debts As They Come Due

As with the difference of opinion amongst courts regarding "bona fide" disputes

pursuant to §303, courts are also divided on the analysis to be applied in a single creditor

involuntary bankruptcy to determine whether a debtor is generally not paying its debts as

they come due. Older cases hold that a so-called "almost per se rule" applies in such a

18

situation, under which "courts are disinclined to grant an order for relief upon an involuntary petition . . . where there is only a single creditor." In re Fischer, 202 B.R. 341, 346 (E.D.N.Y. 1996). However, while still adhered to in some jurisdictions, the "almost per se" rule has been acknowledged to be a minority approach amongst modern courts. See e.g., In re Harmsen, 320 B.R. 188, 191 n. 4 (10th Cir. BAP 2005) ("The 'almost per se rule' is a 'rule' under which a minority of courts are purportedly disinclined to permit an involuntary petition where there is only a single creditor . . . . The majority of courts that have considered this issue have rejected this rule on the basis that there are no statutory grounds for not permitting single creditor involuntary petitions") (emphasis added).

Although the Second Circuit Court of Appeals has yet to rule on the issue and there are no controlling cases from this district on the matter, the Court notes that a sister court in this circuit has explicitly discarded the "almost per se rule" as "inconsistent with the language of 11 U.S.C. § 303(h)(1)." In re Fischer, 202 B.R. 341, 347. (E.D.N.Y. 1996).  Having thus firmly rejected the almost per se rule, the In re Fischer court was compelled to instead fall back on "a close examination of the 'generally not paying test' prescribed by 11 U.S.C. § 303(h)(1)" to resolve that single creditor involuntary bankruptcy.  Id.  In re Fischer ultimately concluded that determining whether an alleged debtor is not generally paying debts as they come due requires a "flexible" approach, one "which admits no hard and fast rules." In re Fischer, 202 B.R. at 350. However, In re Fischer further noted how "courts that have undertaken this analysis have identified the following four factors as guideposts in their inquiry: (1) the number of unpaid claims; (2) the amount of such claims; (3) the matieriality of the nonpayments; and (4) the debtor's overall conduct of its financial affairs." Id.  See also In re Euro-American Lodging Corp., 357 B.R. 700, 713 (Bankr. S.D.N.Y.

2007) (citing to and adopting the four factor "generally not paying" test enunciated by In re Fischer and discussed, supra).

Applying these four "guideposts" to the present case, the Court concludes that EM was generally not paying its debts as they came due. As to the first point regarding the number of unpaid claims, in the instant case, as noted above, the claimed debts consist of payments owed for several different types of insurance coverage which was provided over a span of several years. Additionally, witness testimony and the documentary record each bear out that each individual year was subject to a new Kerin-generated proposal for insurance requiring EM's/Bonanno's approval and possibly a different rate. As such, although some might be tempted to classify EM's alleged indebtedness to Kerin as being only one total debt, the Court views these obligations as several different debts over a span of years. Either way however, the number of unpaid claims is just one among many factors to be considered, and even if it is considered as only one total debt and not several debts for different coverage policies afforded over time, this would not be dispositive. See, 202 B.R. at 350 ("There is substantial authority for the proposition that even though an alleged debtor may owe only one debt, or very few debts, an order for relief may be granted where such debt or debts are sufficiently substantial to establish the generality of the alleged debtor's default") (emphasis added). Next, the amount of those various claims, even setting aside the equipment coverage, is still well above the statutory threshold for an involuntary bankruptcy, as discussed supra. Third, the non-payment by EM in this case is extremely material. This non-payment is material because EM was regularly sent bills that were not objected to. Such conduct is attested to by Mr Bonanno's testimony that he would receive

20

bills that would be sent on to his accountants for payment and his testimony that he never once objected to the coverage he was receiving.

Moving to the fourth point in the analysis regarding EM's overall conduct of its financial affairs, this prong still further supports a conclusion that EM was not generally paying its debts as they came due. Mr. Bonnanno's knowledge that EM was receiving a benefit that would need to be paid for is clearly evidenced in the record by his practice of having others of his affiliates, notably Cross Road Construction, LLC, pay the liabilities that EM Equipment incurred. However, the record also reflects that these payments from other entities were nonetheless not sufficient to fully pay EM Equipment's outstanding liabilities to The Kerin Agency – a reality attested to in the record by Kerin's shifting EM Equipment to direct billing after several years of unpaid premiums. Moreover, Mr. Bonanno's assertion in his testimony that he believed, because he was informed by The Kerin Agency that Cross Roads Construction had a zero balance, that this somehow also inherently indicated that EM also owed nothing to Kerin, Tr. (12/12) at 128-129, while certainly implicating the credibility issues discussed in Section III (A) (a), supra, also provides useful evidence of EM's overall conduct of financial affairs – evidence supportive of a finding that EM was not generally paying its debts as they came due. This is because, contrary to Mr. Bonnanno's assertion, the record clearly establishes that, even if Cross Roads Construction was frequently used to pay EM Equipment's liabilities over the years, the record shows that both companies were billed separately and independently for insurance services provided to them individually by The Kerin Agency. Thus the status of Cross Road Construction, LLC's balance with The Kerin Agency at any given time was no accurate reflection of the status of EM Equipment's liabilities in that same period, however much Mr. Bonnanno

wishes it was.[7] In fact, as discussed above, the overall conduct of EM Equipment's financial affairs is instead very supportive of a finding that it was not generally paying its debts as they came due and the Court so concludes.

## C. Creditor's Duty to Investigate Pre-Petition

EM next argues in opposition to the petition, that Kerin "did no due diligence before bringing this petition." Kerin responds that it is "unaware of any section of the Bankruptcy Code which affirmatively obligates the petitioning creditor to conduct . . . an exhaustive background search prior to filing its petition." To this EM replies, citing to Federal Rule of Civil Procedure 11(b) that "our rules require . . . something more than nothing, which is what Kerin testifies it did, was required prior to bringing this (or any) suit . . . [and t]he Court must hold Kerin accountable for this failure."

Fed. R. Bankr. P. 9011(b), the bankruptcy rule counterpart to Fed. R. Civ. P. 11(b), states in relevant part as referenced by EM, that:

> [b]y presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances,-
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; . . .
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; . . . .

---

[7] The record reflects the fact that Bonanno and his various entities tended to ignore the entity differences amongst them for their own purposes and similarly that they did not appear to view inter-company debt amongst the affiliates to be real debt. However, this preferred interpretation of inter-company debt amongst the Bonanno affiliates cannot form a shield behind which Bonanno's individual entities can hide from their obligations to outside parties. In at least one instance in this record, Olive Street's funds were used to pay EM's debt, see, e.g., supra at pg. 4, yet there was no evidence of EM repaying that debt to Olive Street. The record thus seems, on this basis, to include at least one other creditor.

Fed. R. Bankr. P. 9011 (2013).

The Court finds EM's argument in this regard to be unpersuasive and unclear. The Court does not discern from a review of the record, conduct on the part of Kerin that would rise to a violation of Fed. R. Bankr. P. 9011(b). Further, the Court is unaware of any statute or case law precedent making such a supposed violation, the basis for denial of an involuntary petition. As such the Court concludes that this argument, such as it is, poses no bar to the instant petition.

### IV.   **Conclusion**

In sum, the Court concludes that the petitioning creditor in this matter, The Kerin Agency, has carried its burden of demonstrating by a preponderance of the evidence that it is entitled to an order of relief against the debtor, EM Equipment, LLC, pursuant to 11 U.S.C. § 303(b). A separate order for relief to this effect will issue.

By the Court,

Dated: December 30, 2013

Joel B. Rosenthal,
United States Bankruptcy Judge